UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Nancy J. Winkelman,

                Plaintiff,

v.

AgStar Financial Services, ACA,

                Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 16-3134 ADM/DTS

_____

Jeffrey D. Schiek, Esq., and Philip G. Villaume, Esq., Villaume & Schiek, P.A., Bloomington, MN, on behalf of Plaintiff.

Kerry L. Middleton, Esq., Littler Mendelson, PC, Minneapolis, MN, and Tessa K. Mlsna, Esq., Gray Plant Mooty, Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On August 17, 2017, the undersigned United States District Judge heard oral argument on Defendant AgStar Financial Services, ACA's ("AgStar" or the "Company") Motion for Summary Judgment [Docket No. 18].  Plaintiff Nancy J. Winkelman ("Winkelman") alleges that AgStar retaliated against her in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a).  Compl. [Docket No. 1]  ¶¶ 20–35.  For the reasons set forth below, AgStar's motion is granted.

## II.  BACKGROUND

### A.  AgStar and its Annual Review Process

AgStar is a Financial Services company that provides a broad range of financial services

for agricultural and rural clients in northwestern Wisconsin and Minnesota.  Bridger Decl.

[Docket No. 22] ¶ 2.

Central to this dispute is AgStar's annual employee review process.  In January and

February of each year, supervisors conduct annual performance reviews of their team members.

Mlsna Decl. [Docket No. 21] Ex. A ("Winkelman Dep.") 129:7–10.  Supervisors are instructed

to rate their team members' performance as "On Target" or "Unsatisfactory" using performance

metrics.  Bridger Decl. Ex. 2.  By comparing an employee's performance metrics to that of their

peers, the performance metrics largely serve as the basis for annual salary adjustments and

promotion decisions.  Bridger Decl. ¶ 4; Mlsna Decl. Ex. F; Paur Decl. [Docket No. 23] ¶ 7.

Each year, AgStar sets an overall budget for salary increases, and the Human Resources

("HR") department prepares Salary Administration Guidelines to assist supervisors in

distributing the salary increases within the budget.  Bridger Decl. ¶ 7.  These guidelines also

provide insight into an employee's progression through the salary range for their position.  Id.

Immediate supervisors make initial recommendations of their employees' salary

increases and promotions.  Winkelman Dep. 99:16–100:8.  The initial recommendations are

reviewed and approved by upper management to ensure consistency with AgStar's budget for

annual pay increases.  Mlsna Decl. Ex. V ("Kramer Dep.") 25:23–26:7.

**B.  Winkelman's 2011 Charge of Discrimination**

Winkelman starting working at AgStar as a Farm Records Technician in 1994.

Winkelman Dep. 55:19–20.  She currently works at salary grade 11 as a Senior Business Analyst

in AgStar's Baldwin, Wisconsin location.  Id.  Since 1994, Winkelman has received an annual

salary increase and has been promoted every three to four years.  Id. 43:21–24; 164:3–6.

Winkelman's supervisors have rated her "On Target" in all of her annual performance reviews. Id. 49:2–6; 129:20–23.

On May 5, 2011, Winkelman filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Schiek Aff. [Docket No. 27] Ex. C at 2–5 ("2011 EEOC Charge").  Winkelman alleged that her then-supervisor, Mel Pearson ("Pearson"), made salary and promotional decisions based upon her age and gender.  Id.  Winkelman cross-filed the 2011 charge with the Wisconsin Equal Rights Division ("ERD").  Id. at 1.

AgStar's HR representative, Leah Bridger ("Bridger"), investigated Winkelman's allegations.  Winkelman Dep. 103:15–21; Mlsna Decl. Ex. P ("Bridger Dep.") 39:12–18. Bridger spoke with Winkelman to develop an understanding about her claim.  Bridger Dep. 39:20–25.  Bridger then interviewed Pearson and Winkelman's higher-level supervisors, Owen Thompson ("Thompson") and Jeff Kramer ("Kramer").  Id. 40:13–16.  Bridger stated that her investigation did not substantiate Winkelman's claims, and concluded that AgStar did not discriminate against Winkelman.  Id. 42:12–21.

On August 3, 2012, the EEOC dismissed Winkelman's charge without finding evidence to support her allegations of discrimination.  Mlsna Decl. Ex. C.  The ERD claim remained open until Winkelman voluntarily withdrew it on June 16, 2014.  Schiek Aff. Ex. S.

## C.  Winkelman's 2014 Performance Review

In late 2013, Pearson retired and Bryan Paur ("Paur"), who was Winkelman's peer, was promoted into Pearson's position.  Mlsna Decl. Ex. S ("Paur Dep.") 13:9–14.  Paur directly supervised three employees, including Winkelman.  Paur Dep. 11:4–8.

### 1.  Paur Evaluates Winkelman's Performance

Paur evaluated Winkelman's year 2014 performance in January and February 2015. Winkelman Dep. 129:11–19; Paur Dep. 21:13–15.  During this evaluation period, Winkelman was a Business Analyst, salary grade 10.  Paur Decl. ¶ 4.  In that position, Winkelman worked with AgStar's intermediate sized clients and underwrote loan applications, completed accrual earning and financial reconciliation, and monitored loan performance.  Id.

Winkelman's productivity results were largely based on nine objective performance metrics:  1) number of loans closed; 2) loan amount requested; 3) loan amount approved; 4) financial statements reviewed; 5) earnings statements reviewed; 6) number of financial reviews completed; 7) overrides; 8) farm visits; and 9) client information files.  Paur Decl. ¶ 5, Ex. 1. Paur determined that, compared to her peers, Winkelman scored below average on some, above average on a few, and around average on most of the metrics.  Paur Decl. Ex. 1.  Based upon her scores, Paur evaluated Winkelman's 2014 performance as average.  Paur Dep. 23:21–24.

For the 2014 performance reviews, AgStar budgeted for merit salary increases of 3.1%. Bridger Decl. ¶ 9.  Paur recommended that Winkelman's average performance merited the budgeted 3.1% salary increase.  Winkelman Dep. 131:22–132:4.  Paur did not recommend that Winkelman be promoted into a higher position.  Paur Dep. 40:9–14.

Paur communicated his recommendations to his immediate supervisor, Thompson, who approved them without modification.  Paur Dep. 22:5–11; 25:7–9.  Kramer, AgStar's Vice President of the credit department, also signed off on the recommendations without change. Kramer Dep. 25:23–26:7.

## 2.  Winkelman is Dissatisfied with her Performance Review

On February 17, 2015, Paur met with Winkelman to discuss her performance review.

Paur Dep. 28:22–25.  Winkelman was not pleased with the recommended 3.1% salary increase.

Id. 29:1–6; Winkelman Dep. 134:18–20.  Winkelman also expressed displeasure with Paur's

decisions not to promote her to the Senior Business Analyst position and to deny her an increase

in lending approval authority.  Winkelman Dep. 133:5–24; Paur Dep. 45:12–24.  During their

discussion of her salary increase, Winkelman told Paur she had filed a charge of discrimination

with the EEOC in 2011.  Paur Dep. 32:15–24.  This was the first time Paur was aware that

Winkelman had previously accused AgStar of discrimination.  Id. 29:3–12.  Winkelman then

requested a meeting with Paur and his supervisor, Thompson.  Id.; Winkelman Dep. 138:3–5.

On February 23, 2015, Winkelman, Paur, and Thompson met.  Winkelman Dep. 138:3–8.

Winkelman reiterated her requests for a larger merit increase, a promotion, and increased lending

authority.  Id. 139:15–18.  Thompson denied Winkelman's requests, explaining that her 2014

performance metrics reflected average performance that did not merit an additional pay raise,

promotion, or increased lending authority.[1]  Mlsna Decl. Ex. U ("Thompson Dep.")

33:16–35:16; 63:19–64:8.

During the meeting, Winkelman referred to AgStar as the "Good ol' Boys Club."  Id.

41:13–15.  Winkelman claimed the salary and promotion decisions were made in retaliation for

her 2011 EEOC charge.  Winkelman Dep. 145:7–13.  After the meeting, Thompson reported

Winkelman's claim of discrimination to HR.  Id. 42:2–14.  Bridger spoke with Winkelman about

---

[1] The managers assert that lending authority was not independently discretionary, but was tied to job title.  Paur Dep. 48:13–25.

her concerns on March 10 and 25, 2015.  Bridger Dep. 70:11–16.  During the March 10

conversation, Winkelman stated that she believed the results of her 2014 performance review

were retaliation for filing her 2011 EEOC Charge.  Mlsna Decl. Ex. Q.

**D.  2015 EEOC Charge**

On May 23, 2015, Winkelman filed a second charge with the EEOC.  Winkelman Dep.

148:19–149:4; Schiek Aff. Ex. E.  Winkelman alleged that Paur's recommendations resulting

from her 2014 performance review—the 3.1% merit raise and no promotion or increase in

lending authority—were motivated to retaliate for her filing a 2011 EEOC Charge.  Winkelman

Dep. 148:19–150:5.

On July 1, 2016, the EEOC closed its investigation, concluding that Winkelman's charge

of retaliation lacked merit.  Mlsna Decl. Ex. K, M.

**E.  This Lawsuit**

On September 20, 2016, Winkelman filed a Complaint against AgStar asserting a single

count of retaliatory discrimination in violation of the Age Discrimination in Employment Act of

1967 ("ADEA").  Winkelman alleges that AgStar's decisions not to promote her, and not to

increase her salary and lending approval authority were discriminatory actions in retaliation of

her 2011 EEOC Charge of sex and age discrimination.

Agstar moves for summary judgment.

### III.  DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate if there are no genuine issues of material fact and the

moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the nonmoving party "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).

## B.  Retaliation under the Age Discrimination in Employment Act

The ADEA makes it unlawful  "for an employer to discriminate against any of [its] employees . . . because such individual . . . has opposed any practice made unlawful by this section, or . . . has made a charge, . . . assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."  29 U.S.C. § 623(d).  Because of her prior complaints of age and sex discrimination, Winkelman asserts a retaliatory motive influenced her 2014 performance review results.

"A plaintiff may establish her claim of intentional age discrimination through either direct evidence or indirect evidence."  King v. United States, 553 F.3d 1156, 1160 (8th Cir. 2009).

### 1.  Direct Evidence

Winkelman argues that this is a direct evidence case because the final decisions on Winkelman's merit pay raise, promotion, and lending authority were made just days after she

complained about age discrimination.  Winkelman also argues that there is direct evidence of

AgStar's pattern and history of not allowing women into upper management.

"Direct evidence is evidence showing a specific link between the alleged discriminatory

animus and the challenged decision, sufficient to support a finding by a reasonable fact finder

that an illegitimate criterion actually motivated the adverse employment action."  Ramlet v. E.F.

Johnson Co., 507 F.3d 1149, 1152 (8th Cir. 2007) (quotations and alterations omitted).

This is not a direct evidence case.  The record does not include any comments, remarks,

or actions from Paur or any other supervisor that directly show discriminatory animus.

Winkelman also does not have direct evidence that AgStar's culture explicitly or surreptitiously

operates to stifle the upward mobility of women.[2]

## 2.  Indirect Evidence

ADEA cases without direct evidence of retaliation are analyzed using the McDonnell

Douglas[3] burden-shifting framework.  Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034,

1042–43 (8th Cir. 2007).  Winkelman must first establish a prima facie case of retaliation by

showing that:  1) she engaged in protected activity; 2) she suffered an adverse employment

against; and 3) a causal connection exists between the protected activity and the adverse

employment action.  Logan v. Liberty Healthcare Corp., 416 F.3d 877, 880 (8th Cir. 2005).

"Although the burden of establishing a prima facie case . . . is not onerous, the plaintiff must

satisfy every element of [her] prima facie case, carrying at all times the ultimate burden of proof

---

[2] Winkelman's assertion that AgStar suppresses female advancement is not probative of
the claim she asserts here, retaliation under the ADEA.

[3] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

and persuasion to establish that the employer discriminated against [her] on an impermissible

basis." Grant v. City of Blytheville, Ark., 841 F.3d 767, 773 (8th Cir. 2016) (citation and

quotations omitted).

AgStar argues that Winkelman cannot establish a prima facie case of retaliation because

Paur's raise, promotion, and lending authority recommendations are not causally related to any

protected activity. Winkelman responds that she engaged in protected activity on three different

occasions, once when she filed the 2011 EEOC charge of discrimination, again when she

withdrew this claim from the ERD in June 2014, and also when she raised the issue of

discrimination during the February 23, 2015 meeting with Paur and Thompson. Winkelman

contends that there is a causal connection between these activities and Paur's recommendations,

which she argues is the adverse employment action AgStar took in retaliation to her protected

activity.

Each of Winkelman's claims of protected activity will be discussed in turn.

### a. The 2011 EEOC Charge

It is undisputed that Winkelman's 2011 EEOC Charge is protected activity. AgStar

argues that the 2011 EEOC Charge cannot present a genuine factual issue on retaliation because

the temporal gap between the 2011 EEOC harge and the adverse employment action in February

of 2015 is too distant.

"Generally, more than a temporal connection between the protected conduct and the

adverse employment action is required to present a genuine factual issue on retaliation." Kiel v.

Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc). However, "we have

sometimes held that the timing of one incident of adverse employment action following

protected activity sufficed to establish causal connection." Smith v. Allen Health Sys., Inc., 302

F.3d 827, 832 (8th Cir. 2002).  "The cases that accept mere temporal proximity between an

employer's knowledge of protected activity and an adverse employment action as sufficient

evidence of causality to establish a prima facie case uniformly hold that the temporal proximity

must be very close." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (quotations

omitted).

The lapse of time between the 2011 EEOC charge and AgStar's January and February

2015 employment decisions cannot establish the causal connection necessary to support a

retaliation claim.  The Eighth Circuit has been very reticent to find a causal connection been two

events spanning only a few months in time.  See Weger v. City of Ladue, 500 F.3d 710, 727 (8th

Cir. 2007) ("Though not dispositive, we have previously held that an interval as brief as two

months did not show causation for purposes of establishing a retaliation claim, . . . and that a

two-week interval was sufficient, but barely so . . . ." (quotations omitted, alterations in

original)).  The several year duration between the two events here is far too long to satisfy even

the minimal evidentiary burden at the prima facie stage.

### b.  The June 2014 Withdrawal of the ERD Claim

Winkelman also claims that she engaged in protected activity when she withdrew her

claim with the ERD in June 2014.  Winkelman does not offer legal support for this argument.

Instead, Winkelman merely asserts that her 2014 performance review was the first occasion after

withdrawing the claim when she would have been eligible for a promotion or salary increase.

Winkelman's argument fails for two reasons.

First, the act of withdrawing a claim of discrimination is not protected activity.[4] Winkelman argues that withdrawing the claim gave notice to AgStar that she had no recourse against the Company, implying that AgStar would have been very reluctant from taking adverse action against her while a claim of discrimination was being investigated. But this conflicts with established law that under the ADEA, protected conduct is activity that opposes age discrimination. Trammel v. Simmons First Bank of Searcy, 345 F.3d 611, 615 (8th Cir. 2003); see also Jeseritz v. Potter, 282 F.3d 542, 548 (8th Cir. 2002) (stating that the conduct must involve some kind of opposition to the employer's practice that the employee reasonably believes violates the ADEA). Withdrawing a claim of age discrimination is not behavior opposing an employer's practice that violates the age discrimination statute.

Second, even if withdrawal of a discrimination claim were protected activity, it is undisputed that when Paur made his salary, promotion, and lending authority decisions in January and February 2015, he did not have knowledge that Winkelman had even filed such a claim, much less that she had withdrawn it over six months before their meeting. Since an actionable retaliation claim requires the employer to have "actual or constructive knowledge of the protected conduct," this is not prima facie evidence of retaliation which is actionable under the ADEA. Smith v. Riceland Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998) (quotations omitted).

---

[4] While it was not squarely addressed, one court that considered withdrawing a claim as protected activity found it to be a "unique legal theory." Williams v. Tradewinds Servs., Inc., No. 10-437, 2013 WL 832405, at *7 n.8 (N.D. Ind. Mar. 4, 2013).

### c. The February 23, 2015 Meeting with Paur and Thompson

Finally, Winkelman claims that she engaged in protected activity when she expressed to Paur and Thompson that AgStar was a "Good ol' Boy's Club." AgStar responds that even if Winkelman engaged in protected behavior during the February 23, 2015 meeting, it cannot support her retaliation claim because the comment occurred after Paur made his initial salary and promotion recommendations.

Assuming without deciding that Winkelman's February 23rd comment about the discriminatory work environment at AgStar was protected conduct, it cannot form the basis for a retaliation claim stemming from an adverse employment action that occurred earlier. Paur made his salary, promotion, and lending authority recommendations no later than February 17, 2015. It is of no consequence here that Paur's initial recommendations needed approval from higher-lever supervisors because Paur's recommendations were approved without change.[5]

To save her claim, Winkelman cites cases addressing "cat's paw" liability, which "refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Qamhiyah v. Iowa State Univ. of Sci. & Tech., 566 F.3d 733, 742 (8th Cir. 2009) (quoting EEOC v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006)). In the Eighth Circuit, the "rule provides that an employer cannot shield itself from liability for unlawful [retaliation] by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another

---

[5] A genuine issue of material fact might have been created if Paur's recommendations were modified by higher-level supervisors who had knowledge of Winkelman's prior protected activity.

achieves his or her unlawful design."  Id. (quoting Richardson v. Sugg, 448 F.3d 1046, 1060 (8th

Cir. 2006)).  "Cat's paw" liability does not apply here because Paur, the initial decisionmaker,

did not have knowledge of Winkelman's prior protected activity.  This theory does not save

Winkelman's retaliation claim.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.       Defendant AgStar Financial Services, ACA's Motion for Summary Judgment

[Docket No. 18] is **GRANTED**; and

2.       All claims in the Complaint [Docket No. 1] are **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

                                        BY THE COURT:


                                        _____s/Ann D. Montgomery_____
                                        ANN D. MONTGOMERY
                                        U.S. DISTRICT JUDGE

Dated:  November 7, 2017.